# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

THOMAS PHELPS,

                        Petitioner,             :    Case No. 1:12-cv-896

    - vs -                                  District Judge Michael R. Barrett
                                             Magistrate Judge Michael R. Merz

RHONDA RICHARD, Warden,
 Correctional Reception Center,
                                  :

                    Respondent.

---

# REPORT AND RECOMMENDATIONS

---

       This habeas corpus case is before the Court for decision on the merits.  Petitioner has filed the Petition (Doc. No. 1), a Response to the Return of Writ "Response," (Doc. No. 10) and a Response to Sur-Reply (Doc. No. 17); Respondent has filed an Answer/Return of Writ (Doc. No. 7) and a Sur-Reply (Doc. No. 15).

       Phelps pleads the following Grounds for Relief:

       **Ground One:**  Petitioner was denied due process when there was insufficient evidence to convict him of Aggravated Murder.

       **Supporting Facts:**  The jury erred to the prejudice of the petitioner by finding him guilty of aggravated murder, as these feelings [sic] were not supported by sufficient evidence and the state failed to meet its burden proof.

       **Ground Two:** Petitioner was denied due process when the trial court overruled his motion for acquittal under Ohio Criminal Rule 29.

1

**Supporting Facts:** The trial court erred to the prejudice of the Petitioner by overruling his motion for acquittal under Ohio Criminal Procedure Rule 29, as the state failed to meet its burden of proving that petitioner was guilty of aggravated murder.

**Ground Three:** Petitioner was denied due process and a fair trial when the State failed to preserve the evidence.

**Supporting Facts:** The trial court errored [sic] to the prejudice of petitioner by not granting his motion to suppress the videotape as the State failure to preserve the entire videotape violated petitioner's due process rights.

**Ground Four:** Petitioner was denied due process under the *Batson v Kentucky* standard violating his right to have a fair trial.

**Supporting Facts:** The trial court errored [sic] to the prejudice of the petitioner by allowing the prosecution to peremptorily challenge and dismiss three black jurors because of their race.

(Petition, Doc. No. 1.)

**Procedural and Factual History**

Phelps was indicted by the Hamilton County Grand Jury in 2009 on one count of aggravated murder (Ohio Revised Code "O.R.C." 2903.01(A)) (Count 1) with specifications; having weapons while under disability (O.R.C. 2923.13(A)(3)) with specifications (Count 2), and having weapons while under disability (O.R.C. 2923.13(A)(2)) with specifications (Count 3). (Return of Writ, Doc. No. 7-1, Exh. 1, PageID 60.)   After a jury trial, Phelps was found guilty of all charges.  The trial court sentenced Phelps to life imprisonment without parole for the aggravated murder, a three-year term for the firearm specification, and two five-year terms for having a weapon under disability.  The court ordered the sentences on all three counts to be served consecutively with each other.

Phelps appealed to the Court of Appeals of Ohio, First Appellate District, Hamilton

County, raising seven assignments of error:

> 1. The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of aggravated murder, as those findings were not supported by sufficient evidence.
>
> 2. The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of aggravated murder, as those findings were contrary to law.
>
> 3. The trial court erred to the prejudice of the Defendant-Appellant by overruling his Motion for Acquittal under Ohio Criminal Procedure Rule 29.
>
> 4. The trial court erred to the prejudice of Defendant-Appellant by imposing a sentence that is an abuse of discretion.
>
> 5. The trial court erred to the prejudice of Defendant-Appellant in sentencing him on Counts 2 and 3.
>
> 6. The trial court erred to the prejudice of Defendant-Appellant by not granting his motion to suppress the videotape.
>
> 7. The trial court erred to the prejudice of Defendant-Appellant by allowing the prosecution to dismiss three black jurors.

(Brief, Return of Writ, Doc. No. 7-1, Exh. 1, PageID 77.),

The Hamilton County Court of Appeals, First Appellate District of Ohio set forth the

facts of this case on direct appeal as follows:

> [*P1] Defendant-appellant Thomas Phelps left the Almost Home Bar after a scuffle with an employee and returned shortly thereafter with a loaded gun that he used to shoot and kill the employee. The bar's surveillance system captured these events. As a result, Phelps was later charged with and convicted of one count of aggravated murder and two counts of having weapons under a disability. Despite Phelps's claim that the killing had been provoked, the jury found that he had acted with prior calculation and design.
>
> * * *
>
> [*P3] In the early morning hours on February 9, 2009, Corey Land

3

was working as a bouncer at the Almost Home Bar. At about 1:21:24 a.m., at the bar owner James Tatum's request, Land had gone to Phelps, who had been sitting at the bar, and instructed him to take his feet off a barstool. This angered Phelps, who had a heated conversation with Land before storming out of the bar. Phelps returned immediately and physically attacked Land. The two scuffled on the ground, and others in the bar intervened to separate the two. Phelps suffered a cut to his hand, and he believed that Land had stabbed him with a knife. But none of the eyewitnesses testified that they had seen Land with a knife or another weapon. Two eyewitnesses believed that Phelps had cut his hand on glass that was on the floor of the bar, and one eyewitness believed that Phelps had cut his hand on the bar's bowling machine.

[*P4] After the scuffle, both Phelps and Land were angry. Phelps was asked to leave, and at 1:25:40 a.m. he left the bar. As Phelps left, Land shouted, "I'm going to kill him. * * * Did you see what I did to him?"

[*P5] Tatum decided to close the bar for the night and had the door locked. Most patrons left the bar, except for two women who refused to leave until they finished their drinks. Upon finishing, one of them unlocked the door. While they exited at 1:29:56 a.m., Phelps swiftly reentered the bar, armed with a loaded pistol. He immediately located Land, who was cleaning up behind the bar, and then repeatedly fired at him. Phelps pursued Land as Land ran up and down the space behind the bar in a futile attempt to avoid the gunfire. One of the bullets struck Land in his back and killed him.

*State v Phelps,* 2011-Ohio-3144, 2011 Ohio App. LEXIS 2680 (1st Dist., June 29, 2011).

On June 29, 2011, the court of appeals affirmed the judgment of conviction for aggravated murder and having weapons under disability, but remanded the case for resentencing on the two counts of having weapons under disability, concluding they were allied offenses of similar import committed neither separately nor with a separate animus as to each.

Phelps, through appellate counsel, filed an appeal to the Ohio Supreme Court on November 2, 2011, and was assigned Case No. 2011-1224. The Ohio Supreme Court denied

leave to appeal and dismissed the appeal "as not involving any substantial constitutional question." *State v. Phelps,* 130 Ohio St. 3d 1417, 2011 Ohio LEXIS 2759 (2011).

## SENTENCE MODIFICATION

Pursuant to the remand, Phelps' sentence was modified on August 19, 2011, when the trial court noted in its judgment entry as follows: "The original sentence of life without parole imposed as to count #1 on February 4, 2011 still applies and was not vacated by the court of appeals [sic] decision and therefore not addressed at the resentencing." (Judgment, Return of Writ, Doc. No. 7-1, Exh. 1, PageID 175-6.)

Phelps, through different appellate counsel, filed an appeal from the August 19, 2011, sentence modification as to the weapons under disability charges. Phelps asserted the following assignment of error:

1. The Trial Court erred by not allowing a full re-sentencing hearing for Defendant-Appellant, including a re-sentencing on the charge of aggravated murder.

(Return of Writ, Doc. No. 7-1, Exh. 1, PageID 179.)

The court of appeals affirmed the judgment of the trial court. Phelps, through appellate counsel, filed a timely appeal to the Ohio Supreme Court and was assigned Case No. 2012-1098. The Ohio Supreme Court denied leave to appeal and dismissed the appeal "as not involving any substantial constitutional question." *State v. Phelps,* 132 Ohio St. 3d 1534, 2012 Ohio LEXIS 2325 (2012).

# Analysis

**Grounds One and Two:  Insufficient Evidence**

In his First and Second Grounds for Relief, Phelps claims that his conviction for aggravated murder is not supported by sufficient evidence.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991).  Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after

enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal

court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam*).

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

The First District Court of Appeals considered this claim on direct appeal and wrote:

### Sufficiency- and Weight-of-the-Evidence Claims

[**\*P24**] In his first, second, and third assignments of error, Phelps contends that his aggravated-murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Because Phelps was convicted of aggravated murder under R.C. 2903.01(A), the state was required to establish that Phelps had caused the death of Land and that he had done so purposefully and with prior calculation and design.

[**\*P25**] It was undisputed that Phelps caused Land's death. And the evidence supported a finding that Phelps acted with specific intent to kill  (Ohio Revised Code § 2901.22(A)) where Phelps repeatedly shot at Land with a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death.  See S*tate v. Byrd*, 1st Dist. No. C-050490, 2007 Ohio 3787, ¶38, citing *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 431 N.E.2d 1025. See, also, *State v. Sullivan*, 10th Dist. No. 07AP247, 2008 Ohio 391, ¶13 (holding that "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence").

[**\*P26**] Further, the evidence supported a finding of prior calculation and design. Certainly, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'"  *State v.*

*Cotton* (1978), 56 Ohio St. 2d 8, paragraph two of the syllabus. But "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley* (2001), 93 Ohio St. 3d 253. Ultimately, such a finding is justified "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill."*Cotton, supra*, ¶ 3 of the syllabus.

[**P27**] In this case, there was evidence that Phelps had planned the homicide after his scuffle with Land and that he carried out this plan after leaving the bar by retrieving a loaded firearm, reentering the bar when the door became unlocked, and firing at Land until he killed him. Although less than five minutes expired during Phelps's absence from the bar, the amount of time and the degree of purpose amounted to more than "instantaneous deliberation," as these factors demonstrated "a scheme designed to implement the calculated decision to kill." *Id.*

[**P28**] The evidence showed that there was sufficient time, reflection, and activity involved in Land's murder to satisfy the elements of proof that Phelps had killed him with prior calculation and design. Construing the evidence in a light most favorable to the state, as we are required to do, we hold that any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307. Thus, we conclude that Phelps's aggravated-murder conviction was supported by sufficient evidence.

[**P29**] Phelps argues also that the jury lost its way by rejecting his defense that he was provoked into using deadly force and was therefore guilty only of voluntary manslaughter. But our review of the record fails to persuade us that the trier of fact clearly lost its way and created a manifest miscarriage of justice in rejecting his defense. See *Tibbs v. Florida* (1982), 457 U.S. 31; see, also, *State v. Thompkins* [(1997)], 78 Ohio St.3d 380, 387, 1997 Ohio 52.

[**P30**] A person commits voluntary manslaughter when he knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." Ohio Revised Code § 2903.03.

9

[*P31] While there was evidence that Land had cut Phelps's hand during the scuffle and had yelled as Phelps left the bar that he was going to kill him, the jury was free to reject Phelps's tenuous argument that he was legally provoked over four minutes later when he reentered the bar with a loaded gun to find and to kill Land.

[*P32] We note that the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine. See *State v. DeHass* (1967), 10 Ohio St. 2d 230, paragraph one of the syllabus. Accordingly, we overrule the first, second, and third assignments of error.

*State v Phelps,* 2011-Ohio-3144, 2011 Ohio App. LEXIS 2680 (1st Dist., June 29, 2011).

In arguing these claims in his Response, Phelps emphasizes the asserted weakness of the evidence that he killed the victim, Land, with prior calculation and design. Alternatively, he argues the evidence supporting a reduction to voluntary manslaughter was so strong as to require the jury to return that verdict (Response, Doc. No. 10, PageID 991-1000).

Phelps is correct that there is no "direct" evidence of prior calculation and design, but since that element of aggravated murder is a subjective element, any "direct" evidence would have had to come from Phelps himself by way of an admission of prior calculation and design. There is no such evidence. On the other elements, of course, there is no dispute: there is no doubt that Phelps killed Land by shooting him.

The jury was required to decide the element of prior calculation and design from the facts in evidence. There is evidence from which the jury could have found that Land cut Phelps (although Phelps' blood was also on the broken glass on the floor) and that Phelps was forced out of the bar, rather than leaving voluntarily. Both those facts do not negate the facts – circumstantial evidence though they be – supporting the jury's finding. Had Phelps left the bar voluntarily, he could have re-entered it voluntarily. If he had done so and some significant time

elapsed before the shooting, this case would be more like the cases cited by Phelps where the courts refused to find prior calculation and design from the fact the defendant was carrying a gun when shooting erupted. That is not what happened here: Phelps went to his car and got his gun. He then reentered the bar and began shooting at once. He emphasized that only one bullet struck Land and four other bullets went elsewhere. Phelps was free to argue to the jury that his shooting was reckless, but the jury was free to find that at least one shot was well-aimed and to infer from that a purpose to kill.

Phelps also writes about his rage and that the incident would be sufficient to evoke rage. But the record shows Phelps was put out of the bar and could have gone home. Nothing compelled him to go back into the bar. He did not have property to retrieve or a companion to bring back out. That he entered the bar and immediately began shooting was sufficient to allow the jury to decide that, having gotten his gun, he went back in to use it to kill Land.

This Court is not free to re-weigh the evidence. It is up to the jury in a situation such as this to do that. The First and Second Grounds for Relief are without merit and should be dismissed.

**Ground Three: Failure to Preserve Evidence**

In his Third Ground for Relief, Phelps asserts that the State, in the person of Detective Merkle, destroyed exculpatory evidence by editing it out of the surveillance video recording from the bar.

Phelps presented this claim to the First District Court of Appeals which decided it as follows:

**Failure-to-Preserve-Evidence Claim**

**[\*P10]** In his sixth assignment of error, which we address first, Phelps contends that Merkle violated his due-process rights by failing to preserve surveillance clips from the earlier part of the night and that, as a result, the trial court erred by not suppressing state's exhibit 66, the surveillance clips that Merkle had saved on a DVD. According to Phelps, the unpreserved clips may have shown Land with a knife earlier in the night, and that fact could have bolstered his provocation defense and led to an acquittal on the aggravated-murder charge and a conviction on the reduced charge of voluntary manslaughter.

**[\*P11]** In accordance with the Fourteenth Amendment's Due Process Clause's requirement of "fundamental fairness" in criminal prosecutions, a defendant must be afforded a meaningful opportunity to present a complete defense. *Trombetta v. California* (1984), 467 U.S. 479. This bedrock principle has led to the development of case law in "'the area of constitutionally guaranteed access to evidence.'" Id., quoting *United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, 867; see, also, *Arizona v. Youngblood* [1988], 488 U.S. 51, 55.The state violates a defendant's due-process rights when it fails to preserve "materially exculpatory" [See *Trombetta*, 467 U.S. at 489 (holding thatto meet the materially exculpatory standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means")] evidence, regardless of whether the state has acted in good or bad faith. *State v. Benson*, 152 Ohio App.3d 495, 2003 Ohio 1944, at ¶10; *State v. Myles*, 1st Dist. No. C-050810, 2007 Ohio 3307, at ¶65.

**[\*P12]** But "fundamental fairness" does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood* at 58. Consequently, the state's failure to preserve "potentially useful evidence" does not constitute a denial of due process of law unless a criminal defendant can show bad faith on the part of the police. *State v. Geeslin*, 116 Ohio St.3d 252, 2007 Ohio 5239, syllabus, following *Youngblood*, supra. "Bad faith implies something more than bad judgment or negligence; it imports a dishonest purpose,

12

moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." *Benson*, 152 Ohio App. 3d 495, 2003 Ohio 1944, at ¶14 (internal quotations omitted), cited in *State v. Acosta*, 1st Dist. No. C-020767-71, 2003 Ohio 6503, at ¶9.

[*P13] At the suppression hearing, Merkle testified that he had not observed any footage in the unsaved portion that could have been useful to the defendant, and that this conclusion was bolstered by the statements from the eyewitnesses. These eyewitnesses had reported to the police at the scene that Land's request for Phelps to remove his foot from the barstool had instigated the chain of events that night. Further, Merkle and the state were forthcoming by admitting that the footage had existed.

[*P14] The trial court did not make factual findings when it overruled the motion to suppress, but the record demonstrates that the trial court impliedly found Merkle's testimony credible. Accepting this finding, which is supported by competent, credible evidence, [See *State v. Burnside*, 100 Ohio St.3d 152, 2003 Ohio 5372, at ¶8] we find that the facts do not demonstrate that Merkle failed to preserve materially exculpatory evidence or that he failed to preserve potentially useful evidence in bad faith.

[*P15] Additionally, Phelps was able to argue to the jury that the footage might have showed Land with a knife earlier in the night and that Merkle's conduct reflected a compromised investigation. And the trial court instructed the jury on the offense of voluntary manslaughter even without evidence that Land had a knife earlier in the night. Thus, Phelps was afforded a meaningful opportunity to present a complete defense. Because Phelps has not demonstrated a due-process violation, the record does not manifest any error by the trial court in denying Phelps's motion to suppress. Accordingly, we overrule the sixth assignment of error.

*State v. Phelps,* 2011-Ohio-3144, 2011 Ohio App. LEXIS 2680 (1st Dist. June 29, 2011).

Respondent defends this Ground for Relief on the merits, asserting the First District's decision is neither contrary to nor an objectively unreasonable application of the relevant Supreme Court precedent, *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta,* 467 U.S. 479 (1984).(Return of Writ, Doc. No. 7, PageID 44-51.)

This Ground for Relief relates to what the surveillance camera in the bar recorded both before and after what the parties have referred to as the "trigger" event.  That event happened when Land, who was serving as a "bouncer" at the bar, at the request of the owner asked Phelps to take his feet off a barstool.

Phelps in his Traverse says that the *Trombetta* issue in the case is that Detective Merkle edited evidence "out of the surveillance tape after the 'trigger' event that shows Land stabbing him [Phelps] during the fight, and not the portion of the tape that was edited prior to the fight that might have shown that Land possessed a knife prior to the fight."  (Traverse, Doc. No. 10, PageID 1000.)  Phelps goes on at some length in the Traverse to argue that Merkle took out portions of the tape that show3d the nature of the fight.  *Id.* at PageID 1001.  Again he says

> "[t]his edited video was intentionally reduced in time to exclude evidence that would have played as mitigating factors. . . ." *Id.* at PageID 1002.  He asserts that the "blue screen" that appears during the fight "is consistent with editing markers which would not only indicate that the video was edited, but that it was edited so that it would not be apparent to anyone that viewed the tape at a later time.   This fact alone would suggest bad faith on the part of Merkle.  Phelps was stabbed and hit with a chair during the fight but mysteriously non [sic] of this was available to view because Merkle's edited version never contained this evidence.

*Id.* at PageID 1002.  Petitioner concludes this portion of the Traverse by arguing:

> Phelps contends that the detective knowingly omitted materially exculpatory evidence (not potentially useful evidence), by editing the video to exclude portions that would have shown the nature of the assault. This video tape represented Phelps (sic) sole eye witness, and presented Phelps with his only hope for his provocation defense, and the state basically tampered with this evidence when detective Merkle edited that footage. Phelps is unable to present comparable evidence and hence the destruction of that evidence is fatal and has consequently denied Phelps his due process rights guaranteed by the constitution of the United States as enumerated in *Youngblood*.

*Id.* at PageID 1004.

The Third Ground for Relief as pled in the Petition is that the trial court erred in failing to suppress the videotape because the State had failed to preserve "the entire videotape." The First District understood the Sixth Assignment of Error to be about the fact that the surveillance clips which Detective Merkle had saved to a DVD, State's Exhibit 66, did not include footage from **before** the trigger event. See *Phelps, supra*, ¶ 10.

The Respondent has the same understanding that the First District had. In her Sur-Reply the Warden insists the question presented to the state courts was whether Exhibit 66 should be suppressed because it was not complete as it did not contain footage from **before** the trigger event (Sur-Reply, Doc. No. 15, PageID 1086.) As proof, Respondent cites Phelps' Brief on appeal where he argued:

> In the case at bar, the surveillance videos were not complete; in fact, they appeared to be edited or pieced together. The Springfield Township Police Detective who collected the videos readily admitted during the suppression hearing that he preserved only a portion of the surveillance tapes. (T.p. 8-11, 27). Therefore, the remaining portions were destroyed by the detective in what Mr. Phelps would contend was bad faith. Therefore, there need only be a showing that the remaining portions were potentially useful, such as possibly showing that Mr. Land possessed a knife a [sic] some point during the evening of the shooting. (T.p. 26-27). Because this potentially useful evidence was destroyed by a representative of the State, the remaining portions of the tape should not have been admitted, and the trial court erred by allowing the State to present the tapes to the jury.
>
> The trial court then compounded that error by allowing the State to present its edited version, but not allowing the defense to present its edited version.

(Appellant's Brief, Return of Writ, Doc. No. 7-1, Exh. 1, PageID 94.)

In his Response to the Sur-Reply, Phelps claims that in this paragraph he did present both questions to the court of appeals. (Response to Sur-Reply, Doc. No. 17, PageID 1100.) He takes

five pages to explain how that one paragraph makes both of the claims he says it makes.  He admits that the Brief does not say verbatim that Merkle tampered with the tape, but "the same theory of the argument applies.  If Merkle edited the video tape to only play portions that were helpful to his case, he certainly tampered with the surveillance tape."  *Id.*

When dealing with the failure of the State to preserve evidence which might have exonerated the defendant, there is no due process violation unless the defendant can show bad faith on the part of the police.  *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).  Phelps presented no evidence of bad faith on Detective Merkle's part in the trial court and does not point to any such evidence in the Appellant's Brief.  Instead, he merely "contends" that destruction of the "remaining" portions of the tape was bad faith.

The testimony at the suppression hearing does not support a finding of bad faith.  Merkle testified that he preserved all of the recording from the trigger event forward and that there was nothing exculpatory (such as Land having a knife) in what was recorded before the trigger event.  As the First District noted, the trial court obviously found Merkle credible because it denied the motion to suppress.  Phelps point to no reason why this Court should not accept that finding and Respondent points to a good deal of eyewitness testimony which corroborates what Merkle had to say and which comes from witnesses without any obvious reason to favor one side or the other.

Phelps' argument on direct appeal is far from clear insofar as he now says two claims were made.  But giving him the benefit of the doubt on that point does not advance his Third Ground for Relief.  He claims the court of appeals did not decide the evidence tampering portion of the claim. (Response, Doc. No. 17, PageID 1100.)  But if, as Phelps asserts, that claim was made in his Sixth Assignment of Error and that assignment was then denied, this habeas court

must read the First District's opinion as deciding both claims on the merits.  When a federal claim is fairly presented but not addressed, "a federal habeas court must presume that the federal claim was adjudicated on the merits. . ."  *Ross v. Pineda*, 2013 U.S. App. LEXIS 25481 (6th Cir. 2013), quoting *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013).  As noted above, when a federal constitutional claim is decided on the merits by the state courts, a federal habeas court must defer to that decision unless it is (1) contrary to or an objectively unreasonable application of Supreme Court precedent (28 U.S.C. § 2254(d)(1)) or resulted on a decision that is based on an unreasonable determination of the facts based on the evidence presented in the State court proceedings (28 U.S.C. § 2254(d)(2)).

Phelps can meet neither of those standards.  His claim that Merkle tampered with that portion of the surveillance tape he preserved is based entirely on Phelps' own speculation that "blue screens" show editing marks.  Merkle was found to be credible and testified both that there was nothing exculpatory in the destroyed portion of the tape and nothing was edited out of the portion he preserved on DVD and that was played to the jury.  There is no corroboration from the independent eyewitness that Phelps was hit with a chair and stabbed before he left to get his gun.

The Third Ground for Relief should therefore be dismissed with prejudice.


**Ground Four: Racially-Biased Exercise of Peremptory Juror Challenges**


In his Fourth Ground for Relief, Phelps claims he was denied a fair trial when the trial judge permitted the prosecutor to exercise racially discriminatory peremptory juror challenges. This claim was presented to the First District which decided the claim as follows:

17

***Batson*** **Claim**

[**\*P16**] We next address Phelps's seventh assignment of error. Phelps, who is an African-American, argues that the state used peremptory challenges to excuse three prospective jurors because of their race, in violation of his equal-protection rights under *Batson v. Kentucky* (1986), 476 U.S. 79.

[**\*P17**] A *Batson* claim is adjudicated in three steps. If the opponent of the peremptory challenge makes a prima facie case of racial discrimination, then the proponent of the challenge must provide a racially neutral explanation for the challenge. Id. at 96-98. Finally, the trial court must determine based on all the circumstances whether the opponent has proved purposeful discrimination. Id. at 98. A trial court's conclusion that the proponent did not possess a discriminatory intent will not be reversed on appeal unless it is clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, following *Hernandez v. New York* (1991), 500 U.S. 352; *State v. Glenn*, 1st Dist. No. C-090205, 2011 Ohio 829, ¶19.

[**\*P18**] During jury selection, the state questioned the prospective jurors and exercised peremptory challenges to excuse jurors nine, eight, and eighteen, all African-Americans. Phelps raised a *Batson* claim after each peremptory challenge.

[**\*P19**] The prosecutor proffered that she had excused potential juror nine because of her overall demeanor, as demonstrated by facial expressions and boisterous responses, and potential juror eighteen because his overall demeanor and short answers indicated a lack of rapport. The trial court found that these were raceneutral reasons that were specifically supported by its own observations, and it rejected a finding of purposeful discrimination.

[**\*P20**] On this record, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous with respect to these two potential jurors.

[**\*P21**] The prosecutor proffered that she had excused potential juror eight based on the potential juror's family members' involvement in the criminal justice system, including a close cousin with a murder conviction and a brother who had recently been convicted of drug and robbery offenses, and the potential juror's employment at a facility for troubled youths. The trial court found the state's raceneutral explanation supported by the record and also rejected a finding of purposeful discrimination.

[*P22] Although we are unable to determine from the record before us, which does not include the juror's questionnaire, that this potential juror's brother had been convicted of a robbery offense, the record demonstrates that the state had otherwise accurately summarized the potential juror's family's criminal history and his place of employment. Thus, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous.

[*P23] In sum, we are unable to find clear error in the trial court's determination that the state's use of peremptory challenges to dismiss three African-American potential jurors was not racially motivated. Because the record does not manifest the error assigned, we overrule the seventh assignment of error.

*State v. Phelps,* 2011-Ohio-3144, 2011 Ohio App. LEXIS 2680 (1ˢᵗ Dist. June 29, 2011).

*Batson v. Kentucky*, 476 U.S. 79 (1986), prohibits race-based peremptory challenges by a prosecutor.  A state criminal defendant can establish a *prima facie* case of purposeful racial discrimination in the selection of jurors solely by proof of peremptory challenges to exclude members of the defendant's race.  *Batson, supra.*

A trial court must use a three-step process to evaluate a *Batson* claim.  First, the opponent must make a *prima facie* showing that the proponent of the strike has exercised a peremptory challenge on the basis of race.  The burden then shifts to the proponent to articulate a race-neutral reason for the challenge.  Finally, the trial court must determine if the opponent has carried his burden of proving purposeful discrimination.  *Purkett v. Elem,* 514 U.S. 765 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991).  To make a *prima facie* showing, a defendant must show that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venire person of the same race, and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner.  *Batson,* 476 U.S. at 79.  The defendant is entitled to rely on the fact that the

peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so. *Id.*

A trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990)   A *Batson* error is never harmless, but rather is a structural error. *United States v. McFerron,* 163 F.3d 952 (6th Cir. 1998), relying on *Arizona v. Fulminante,* 499 U.S. 279 (1991).   A State may not require a prosecutor to meet a more likely than not burden at the *prima facie* stage. *Johnson v. California,* 545 U.S. 162 (2005).

> Analysis of a claim of discrimination in the prosecutor's exercise of peremptory challenges in juror selection follows the three-part framework established in *Batson:* (1) the defendant must make a prima facie showing of discrimination; (2) the burden then shifts to the prosecution to provide a race-neutral explanation for the challenge; and (3) the defendant then has the opportunity to rebut the proffered race-neutral reason as pretext, and the trial court determines whether the defendant has established purposeful discrimination. 476 U.S. at 93-98; *accord Braxton [v. Gansheimer]*, 561 F.3d [453] at 458-59 [(6th Cir. 2009)]. The defendant "always bears the ultimate burden of persuasion. *Braxton*, 561 F.3d at 459."

*Akins v. Easterling*, 648 F.3d 380, 387 (6th Cir. 2011).  The burden of persuasion always remains with the party opposing the peremptory challenge. *Rice v. Collins*, 546 U.S. 333, 338 (2006).

Phelps argues his *Batson* claim separately as to each of the three excluded African-American prospective jurors, although because a *Batson* error is structural, he need only prevail as to one.  See *Snyder v. Louisiana,* 552 U.S. 472 (2008).[1]

With respect to both Prospective Jurors 9 and 18, the prosecutor relied in part on observations of their demeanor (different demeanors for the two prospective jurors).  Although

---

[1] Cited by Phelps as *Allen v. Louisiana*, presumably because Allen was Petitioner Snyder's first name.

as Phelps points out, the record does not record those demeanors, it typically would not since recording of most trials is by audio recording equipment or machine stenography. However, the trial judge found for the record that the demeanors which concerned the prosecutor in fact happened. Such observations by the trial judge of the demeanor of challenged prospective jurors are particularly important. *Snyder*, 552 U.S. at 477.

As to prospective juror 9, Phelps criticizes the trial judge's characterization of her answer to a general question about attitudes toward police. She said "I don't always say police tell the truth." The trial judge characterized her response as being that the police lie. (Return of Writ, Doc. No. 7-4, Exh. 4, PageID 471.) The Court believes that is a fair characterization because the prospective juror's statement, which she repeated verbatim, was in response to a general question about attitudes toward the police and it is a fair implication from what she said that she believes police do lie, at least on some occasions. In other words, it was fair to hear the comment as being about police honesty as opposed to accuracy in remembering and conveying the truth. In any event, there is no question that reliance on this response is race-neutral and the court of appeals did not rely on that finding to uphold the challenge.

Prospective juror 8 revealed that a close cousin had been convicted of murder and a brother had been convicted of drug dealing and robbery. The prospective juror himself worked at an organization providing services to "troubled youth." Those are objective race-neutral facts which might be expected to lead a person to be sympathetic to a criminal defendant. According to Phelps, the prospective juror disclaimed any subjective sympathy for his brother and any detailed knowledge about his cousin's case. However, the prosecutor was not obliged by law to believe the subjective statements and the trial court rejected the claim that the prosecutor's statements were a pretext for racial discrimination.

21

The prosecutor's basis for rejection of prospective juror 18 was also demeanor-based, albeit different demeanors from prospective juror 9.  The trial judge confirmed his observation of those demeanors and found the reason was race neutral.   Phelps claims the reason was not race neutral, but offers no reason, either supported by the record or otherwise, to believe that the observed demeanors are somehow characteristic of African-Americans.

Phelps argues that the same demeanor displayed by prospective juror 18 was also displayed by non-African-American prospective juror 14 who was not excused.  This prospective juror was the last person seated and the last person questioned by the prosecutor; she was asked only four questions, all of a leading nature which would be expected to produce yes or no answers.  Phelps also points to no place in the record where his counsel argued that prospective jurors 14 and 18 presented the same demeanor.  Certainly no argument along these lines was made in Phelps' brief on appeal (See Brief, Return of Writ, Doc. No. 7-1, Exh. 1, PageID 95-96.)

As noted above, the trial judge's conclusion that a peremptory challenge is not racially discriminatory can only be overcome by clear and convincing evidence.  The First District held that Phelps had not met that standard.  Its conclusion is neither contrary to nor an unreasonable application of *Batson* nor based on an unreasonable determination of facts in light of the evidence.

The Fourth Ground for Relief should therefore be dismissed with prejudice.


**Conclusion**


On the basis of the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice.  Because reasonable jurists would not disagree with this

conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

May 8, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).